UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE CITY OF NEW YORK,                              :
                                                  :
                                Plaintiff,        :
                                                  :      OPINION AND ORDER
                  - against -                      :
                                                  :      06 Civ. 13122 (RJS) (RLE)
GROUP HEALTH, INC., et al.,                        :
                                                  :
                                Defendants.        :

RONALD L. ELLIS, United States Magistrate Judge:

## I.  INTRODUCTION

On April 20, 2007, this Court issued an Opinion and Order denying, without prejudice,

the City's motion to compel Defendant HIP to produce certain documents responsive to the

City's document requests, namely cost and experience documents relating to its accounts, with

this information broken down by employer/customer (hereinafter "HIP data" or "data"). (Opinion

and Order, April 20, 2007 ("Op. & Order") at 4; *see* Plaintiff's Memorandum of Law in Support

of Motion to Compel Under Federal Rule of Civil Procedure 37(a), October 25, 2007 ("Pl.'s

Mem., Oct. 2007") at 1.) Pending before this Court is the City's renewed motion for an order

compelling HIP to produce this data. *Id.* For the reasons set forth below, the City's motion to

compel production of these documents is **GRANTED**.

## II.  BACKGROUND

### A. April 20, 2007, Opinion & Order

In its previous motion, the City indicated that the requested information was needed so

that it could perform an analysis to determine "whether, and if so by how much, HIP will be able

to raise the premium for its HMO product to the City following the [proposed] merger [of GHI

and HIP]."[1] (Plaintiff's Memorandum of Law in Support of Motion to Compel Under Federal

Rule of Civil Procedure 37(a), February 13, 2007 ("Pl.'s Mem., Feb. 2007") at 6-7.) The Court

found that, because the information requested would be insufficient standing alone to calculate a

post-merger cost analysis, the City's request did not adequately relate to its stated justification for

obtaining such information. (Op. & Order at 5-6.) Based on the record presented at the time, the

Court concluded that only upon obtaining a substantial amount of similar data from third-party

health insurance consumers located within the same market-base would the City be able to

perform a comparative analysis with any probative value. *Id.* at 5. At that time, the City did not

have, and had no plan to obtain, the supplemental information from third parties the Court found

necessary to this analysis. *Id.* The Court noted that if the City could articulate a plan for obtaining

third-party information and specify which "commercial entities would be necessary for a

calculation of the merged entity's profitability of raising prices to have any predictive validity,

and that it has the ability to obtain such information from the identified third parties[,]" the Court

would allow for reconsideration. *Id.* at 6.

**B. City's Actions in Response to Court's April 20, 2007, Opinion and Order**

Subsequent to this Court's April 20, 2007, Opinion and Order, further dispute arose

between the parties regarding the City's Second and Third Requests for Documents and a Second

Interrogatory Request. (Declaration of John R. Low-Beer, October 25, 2007 ("Low-Beer Decl.,

Oct. 2007") at 5.) On August 28, 2007, the City filed a second motion to compel "the production

---

[1]The underlying antitrust action was commenced by the City of New York on November 13, 2006, against Group Health, Incorporated ("GHI"); HIP Foundation, Inc.; and Health Insurance Plan of Greater New York (latter two defendants, collectively "HIP") seeking temporary and permanent injunctive relief to prevent the merger of GHI and HIP, providers of health insurance. (Compl. ¶ 1.) Defendants deny that the affiliation will have an anti-competitive effect on the relevant health insurance market. (*See* HIP Answer at 7.)

of documents and responses to interrogatories, and for reconsideration" of the Court's April 20, 2007, Opinion and Order. The information requested by the City at that time was distinct from that requested in the initial motion to compel. *Id.* at 4. Subsequently, the parties engaged in negotiations which resulted in substantial accommodation on nearly all issues pertaining to the Second and Third Document Requests, and the City agreed to withdraw its August 28, 2007, Motion to Compel without prejudice. *Id.* at 5.

On October 25, 2007, the City filed the instant motion, asking the Court to reconsider the April 20, 2007, Opinion and Order, and to compel production of the documents requested in their initial discovery request. (Pl.'s Mem., Oct. 2007 at 1.) In support of this motion, the City reports "the 'record before the Court' has evolved significantly from that before the Court in the Spring." (Low-Beer Decl., Oct. 2007, ¶ 16.) The City asserts it has a "plan to obtain information from third parties . . . and has served subpoenas on a number of large employers and other insurers." *Id.* ¶ 3. The City additionally presents different economic models which they argue minimize, if not entirely eliminate, the need for third-party data to predict the likelihood and profitability of HIP raising its premiums post merger. (*See* Pl.'s Reply at 1.)

### III. DISCUSSION

#### A. Relevance

The ultimate issue in this antitrust action is whether the merger of GHI and HIP will substantially lessen competition when the entities cease to compete with each other, and as a result, whether HIP will have the ability to profitably raise its prices. (*See* Defendants' Memorandum of Law in Opposition to Motion to Compel the Production of Cost and Experience Documents, March 6, 2007 ("Defs.' Mem., Mar. 2007") at 2; *see also* Pl.'s Mem., Feb. 2007 at

7.)  The City argues that customer-specific cost information is relevant because it is necessary to

calculate the relative profitability of the City's business compared to HIP's other large-group

customers, in order to calculate the net profitability to HIP of a given increase in its premiums

after the merger. (Pl.'s Mem., Oct. 2007 at 6.) In response to the City's first motion on this issue,

the Court concluded that, with adequate data from third parties, the documents at issue here

could be applied to a comparative analysis, the results of which would present a prediction of the

effect of the merger on insurance premiums. (Op. & Order at 5-6.) The Court determined that

under such conditions, the controversial HIP data could lead to information relevant to the instant

litigation. The question before the Court here is whether the City now has adequate information

to engage in an analysis of the profitability to HIP of raising its premiums post-merger.

In support of its contention that such analysis would be possible with the various data

available to them and the HIP data here at issue, the City has submitted declarations by Frank R.

Lichtenberg, an expert in the economics of health care. (*See generally* Declaration of Frank R.

Lichtenberg, August 28, 2007 ("Lichtenberg Decl., Aug. 2007") & Declaration of Frank R.

Lichtenberg, November 16, 2007 (Lichtenberg Decl., Nov. 2007").) In response, Defendants

have provided the declaration of their own expert, Lawrence Wu, who specializes in antitrust and

competition policy, with expertise in the area of health care, including health insurance. (*See*

*generally* Declaration of Lawrence Wu, November 9, 2007 ("Wu Decl., Nov. 2007").)

Defendants challenge the predictive value of the data available to the City and assert that the

information the City has access to is inadequate to perform the necessary analysis using any of

the proposed models the City plans to use, namely the critical loss analysis[2] and merger

simulation models.[3]

The City's expert avers that the data from HIP is "highly relevant" to an antitrust inquiry,

(Lichtenberg Decl., Aug. 2007, ¶ 5), and the City argues that HIP put raising their premiums at

issue by repeatedly asserting that they would lose too many commercial customers if they were to

raise their prices. (Low-Beer Decl., Oct. 2007, ¶ 20.) Defendants argue that the City has failed to

comply with the parameters established by the Court in the April 2007, Opinion and Order.

(Defs.' Mem., Nov. 2007 at 2.) Defendants note that they were provided with eighteen CDs of

documents that the City compiled in response to various subpoenas or from insurers in response

to a recent bid solicitation, and they argue these documents do not "provide the data necessary to

perform with any predictive validity either the critical loss analysis that Professor Lichtenberg

originally stated that he intended to perform, or the merger simulation that he now claims would

have more relaxed data requirements." *Id.* at 5. The City replies and requests that "[t]his Court,

looking on the record now before it, should draw its conclusions from that record, while also

bearing in mind that the present record remains fluid and will be supplemented with additional

materials." (Pl.'s Reply, Nov. 2007 at 5.)

This Court previously determined that the information from HIP may be relevant to a

determination of whether and, if so, by how much HIP will be able to raise its premiums if

---

[2]Critical loss analysis is a model Lichtenberg identifies as commonly used "for estimating the effects of a merger on prices using only cost, pricing, and other data from the merging parties." (Lichtenberg Decl., Aug. 2007, ¶ 7.)

[3]"Merger simulations models" here refers to a category of models that presumably includes Bertrand models, and the category is further organized in two types: calibrated-demand models and estimated-demand models. (*See* Lichtenberg Decl., Aug. 2007, ¶¶ 7 *et seq.*; *see also* Wu Decl., Nov. 2007, ¶¶ 3 *et seq.*; Lichtenberg Decl., Nov. 2007, ¶ 4.)

coupled with adequate third-party data for use in a comparative analysis. The Court further

cautioned that mere "random samples of other customers may not yield a statistically appropriate

example." (Op. & Order at 6.) The Court now must determine whether the City complied with,

and made the showing required by, the April 2007 Opinion and Order, and if the Court should

reconsider compelling production of the HIP data.

### 1. Information Acquired by City

As of November 2007, the City had succeeded in obtaining employer-specific pricing and

enrollment information from a total of four of the fourteen employers and all four insurers that it

had subpoenaed. (Pl.'s Mem., Oct. 2007 at 3.) Through discovery requests and interrogatories the

City now has information regarding HIP and GHI's "enrollments and premium rates over time

broken down by their largest customers" as well as "information about plans offered by other

health insurers" in the New York region. (Lichtenberg Decl., Nov. 2007, ¶¶ 16-17.) As

supplemental sources of information, the City notes that it has plans to utilize data received from

certain public sources, including the New York State Department of Insurance ("NYDOI") (Pl.'s

Mem., Oct. 2007 at 8), the New York State Department of Civil Service (Declaration of June R.

Buch, November 16, 2007 ("Buch Decl., Nov. 2007"), ¶ 4), and two open-source public

databases (Lichtenberg Decl., Nov. 2007, ¶¶ 14-15). Lichtenberg indicates he has also reviewed

additional information received by the City, including "enrollment and premium data from

Oxford/United Health Care on its 20 largest (ranked by number of subscriber months) New York

Groups over the last three years . . . and data obtained from Con Edison on enrollment,

premiums, and characteristics of all of its health plans for the period of 2002-2007." *Id.* ¶ 13.

Finally, the City represents that it is still receiving discovery and data relevant to their proposed

comparative analysis. (Buch Decl., Nov. 2007 at 2.)

### 2. Adequacy of Information Now Available to City

In his original declaration, accompanying the City's First Motion to Compel, Lichtenberg

indicated the relevance of the HIP data, concluding that financial data by individual employees is

necessary to accurately predict the effect of the merger on insurance premiums. (*See* Op. & Order

at 4.) By declaration submitted with the City's withdrawn Second Motion to Compel Production

of these documents, Lichtenberg asserted that, in light of the other data the City then had and was

in the process of receiving from GHI and HIP, the requested HIP data alone would be adequate to

enable the City to calculate a lower-bound estimate of the amount by which HIP could profitably

raise its prices after the merger. (*See* Lichtenberg Decl., Aug. 2007, ¶ 7.) Lichtenberg references

two types of models, critical loss analysis and Bertrand models, which he opines are less

demanding with respect to the input information required. *Id.* He asserts that such models are

commonly used for estimating the effects of a merger on product cost, and require only pre-

merger cost, pricing and other data from the merging parties. *See id.*; (Pl.'s Mem., Oct. 2007 at

8.) Lichtenberg elaborates, stating that "[d]ata from GHI and HIP, together with more limited

information on the general level of pricing and sales of other insurers, are sufficient to predict

price increases post-merger. Additional data, including data that plaintiff has sought through

subpoenas and data available from public sources, will make the economic models more accurate

and more powerful." (Lichtenberg Decl., Aug. 2007,  ¶ 13.)

In responding, Wu argues that both critical loss analysis and Bertrand models require

virtually the same data. (Defs.' Mem., Nov. 2007 at 3; Wu Decl., Nov. 2007, ¶¶ 4, 33, 35-38.)

Defendants assert that to perform either analysis properly it is necessary to possess nearly all of

the same data, including estimates of the own-price elasticity of demand[4] and the cross-price

elasticity of demand.[5] Furthermore, in the context of health insurance markets there are two

components to each calculation: 1) the employer level and 2) the employee level. (Defs.' Mem.,

Nov. 2007 at 2-3; Wu Decl., Nov. 2007, ¶ 10.) Wu proposes that to "accurately and reliably

estimate the total enrollment loss[,]" reliably estimate the demand elasticities, or determine

market definition using critical loss analysis more systematic data collection would be necessary.

(Wu Decl., Nov. 2007, ¶¶ 6, 31.) Defendants also argue that specific information not obtained by

the City is necessary for calculating both levels of demand elasticity and this data must come

from many employers, span many years, and include many other data factors. (Defs.' Mem., Nov.

2007 at 7; Wu Decl., Nov. 2007, ¶¶ 25-28.) Nevertheless, Lichtenberg maintains that the data

from third parties *is* adequate to estimate elasticities of demand and other necessary components

to the equations for which the City moves to compel production of HIP's data. In his reply

affidavit, he argues that Wu's comments address only estimated-demand models and not

calibrated-demand models,[6] and that the latter require considerably less data. He notes, moreover,

that some estimated-demand models require very few parameters. (Lichtenberg Decl., Nov. 2007,

¶ 5.) Concomitantly, the City outlines its plan for collection of third-party information and notes

that the process is ongoing. (*See* Pl.'s Mem., Oct. 2007 at 3-4.)

---

[4]Own-price elasticity of demand is a "measure of the willingness of purchasers to shift from one product or service to another in response to a change in the price of that product or service." (Defs.' Mem., Nov. 2007 at 3.)

[5]Cross-price elasticity of demand is a "measure of the willingness of purchasers to shift from one product or service to another in response to a change in the price of a competing product or service." (Defs.' Mem., Nov. 2007 at 3.)

[6]Although Wu did not address both types of models, Lichtenberg appears not to have noted the distinction in his August affidavit.

Defendants and Wu also challenge the City's plan, questioning whether the City's data from four insurers and fourteen New York City employers would supply sufficient third-party information for analysis, and further critiquing the City's limited success with receiving data from even those parties. (Defs.' Mem., Nov. 2007 at 6-7; *see generally* Wu Decl., Nov. 2007, ¶¶ 5-9, 19-31.) Wu recognizes that the data produced to date has some value, but argues that it is inadequate to "make the necessary and complex estimations required for a demand elasticity study." (Wu Decl., Nov. 2007, ¶ 9.) Wu challenges Lichtenberg's proposed models of analysis by indicating that Lichtenberg makes many assumptions, which must first be tested for their factual validity. *Id.* ¶ 14. Wu further argues the public information available from NYDOI is not sufficiently comprehensive to provide the information necessary to estimate demand elasticities. *Id.* ¶ 32. Wu concludes that Lichtenberg does not have the data necessary to reliably predict the impact of the merger. *Id.* ¶ 33.

In response to Defendants' critique of the City's plan to obtain data and the adequacy of what it had received, the City indicates the process is ongoing and that, even in the week between Defendants' Response and the City's Reply, significant additional data collection had taken place, including, *inter alia*, data from GHI and HIP, data from private and public third-party employers, and data from additional third-party health insurers. (Buch Decl., Nov. 2007, ¶¶ 3-5.) Lichtenberg concludes that "[a]s the amount of relevant data available increases, so too will the power and accuracy of the models discussed here to predict the effect of the merger and the defendants' ability to raise prices." (Lichtenberg Decl., Nov. 2007, ¶ 18.)

Lichtenberg also indicates that some of the figures Wu alleges must be determined for use in the merger simulation models have already been estimated, such as the diversion ratio, which

Wu argues is developed from demand-elasticity figures. *Id.* ¶ 6; (*see* Wu Decl., Nov. 2007, ¶ 37.)

Further, he posits that "[w]hen the data required to implement an estimated-demand simulation

model are not available, a calibrated-demand simulation model, which is based on additional

assumptions about the nature of demand, can be used." *Id.* ¶ 7. Such models, he identifies,

include the logit demand model and the Proportionality-Calibrated Almost Ideal Demand System

("PCAIDS"). *Id.*; *see also id.* ¶ 9. Lichtenberg explains that PCAIDS "requires only information

on market shares and reasonable estimates of two elasticities. Estimates of these elasticities often

can be obtained from marketing information, or when appropriate, through demand estimation."

*Id.* ¶ 9. Finally, Lichtenberg asserts that "[t]he models can be used to review the potential

antitrust exposure resulting when unilateral effects issues are raised but sufficient information is

not available to estimate reliably a full set of cross-price elasticities." *Id.* As this information was

provided in the City's Reply Declaration, Wu did not specifically address the models identified

therein by Lichtenberg. From a review of PCAIDS, as presented by Epstein & Rubinfeld,[7] it

appears there may be sufficient data available, with the production of the HIP data here at issue,

to utilize this model. The question remains whether the resulting calculations have sufficient

predictive value.

　　In presenting this motion to compel, both the City and Defendants rely heavily, if not

exclusively, on the declarations of their experts to prove or dispute the relevancy and utility of

the HIP data at issue. They frame the relevancy discussion in such a way that leaves the

resolution requiring a determination of the weight to be given to the respective experts. This is a

---

[7] Roy J. Epstein & Daniel L. Rubinfeld, *Merger Simulation: A Simplified Approach with New Applications*, 69 ANTITRUST L.J. 883 (2002).

matter best left for the trier of fact.[8] For discovery purposes, the basic question is whether the

requested data "appear[] reasonably calculated to lead to the discovery of admissible evidence."

FED. R. CIV. P. 26(b)(1). Essentially, Defendants' expert challenges whether the data would allow

for an *ideal* analysis, where the resulting calculation would be highly predictive. (*See* Defs.'

Mem., Nov. 2007 at 6 (challenging whether "*meaningful* analysis of customer reaction to any

hypothetical post-merger price increase" can occur with the data available to the City at that

time) (emphasis added).) While the City's expert makes no grand assertions about the predictive

value of the analysis based on the available information, he demonstrates that an analysis *may* be

done with the third-party data, the GHI & HIP documents already provided to the City, the

publicly available data, and the HIP data here at issue.

Based on the record now before the Court, the data will lead to information relevant to

the instant antitrust litigation.[9]

## B. Balance of Interests for Production of HIP Data

A final determination the Court may consider is whether a balance of interests would

favor precluding the City from discovering the HIP documents. While Defendants do not focus

on the adverse impacts disclosure of the HIP data would have, and do not raise such as grounds

---

[8] "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (referenced by Werden, et al., *infra* note 9).

[9] Defendants' concerns also may have implications for a *Daubert* analysis although this opinion does not involve that level of inquiry. *See generally Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). *Daubert* and its progeny "address[ ] the admissibility of expert testimony at trial." Gregory J. Werden, Luke M. Froeb & David T. Scheffman, *A* Daubert *Discipline for Merger Simulation*, 18 ANTITRUST 89, 89 (2004) (noting the *Daubert* "gatekeeping" requirement applies to economic expert testimony in merger cases and proposing a standard for determining admissibility based on the relationship between the model employed and the facts of the case at issue).

for protecting discovery of this data in the instant motion,[10] in the April 2007, Opinion & Order, the Court acknowledged that HIP's data is sensitive, and indicated it may "consider the burden the production would have on the business integrity of the party from whom the information is sought." (Op. & Order at 6.)

Weighing the circumstances and evidence presented here, the Court finds: 1) it would not be unduly burdensome for HIP to produce the data, as the data has already been compiled; 2) the detailed confidentiality order in place in this litigation protects against concerns about supplying any commercially sensitive information or interfering with Defendants' business integrity; and 3) any concerns about the City learning information that may have an adverse impact on their own retention of HIP as an insurance-provider ought to be similarly assuaged by the confidentiality order in place. Therefore, the balance of interests favors production of HIP's data to the City, as the City has made a substantial showing that the data is relevant.

## IV. CONCLUSION

For the foregoing reasons, the City's motion to compel is **GRANTED**.

**SO ORDERED this 21st day of November 2008**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

---

[10]HIP does argue disclosure of the information to individual customers would allow customers whose cost and experience is more favorable to drop the coverage, and by adverse selection undermine the goals of HMO community-rating. (Defs.' Mem., Nov. 2007 at 2.)