UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 11, 2010
```

———————————

No. 06 Civ. 13122 (RJS)

———————————

THE CITY OF NEW YORK,

Plaintiff,

VERSUS

GROUP HEALTH INCORPORATED, HIP FOUNDATION, INC., AND
HEALTH INSURANCE PLAN OF GREATER NEW YORK,

Defendants.

———————————

MEMORANDUM AND ORDER
May 11, 2010

———————————

RICHARD J. SULLIVAN, District Judge:

The City of New York brings this antitrust action, seeking to unwind the merger of Defendants Group Health Incorporated ("GHI") and the HIP Foundation.[1]  Now before the Court are Defendants' motion for summary judgment and Plaintiff's cross-motion to amend its Complaint.  For the reasons stated below, Defendants' motion is granted, and Plaintiff's motion is denied.  Accordingly, the case will be closed.

---

[1] Also named as a Defendant is the Health Insurance Plan of Greater New York ("HIP"), the subsidiary of the HIP Foundation that actually provides insurance coverage to consumers.

I. BACKGROUND

A. Facts

1. The Health Benefits Program

Current and former employees of the City of New York, as well as their dependents, receive health benefits through the City's Health Benefits Program. (Defs.' 56.1 ¶ 37.)  In addition to approximately one million individuals associated with the City, the Program also covers an additional 200,000 employees of thirty-five City-related agencies and entities, such as the New York City Housing Authority, the New

York Public Library, and the Metropolitan Museum of Art. (Pl.'s 56.1 ¶ 1.)

The Health Benefits Program is administered by the City's Office of Labor Relations ("OLR"). (Defs.' 56.1 ¶ 37.) The OLR works in conjunction with the Municipal Labor Committee ("MLC"), a multi-union organization, to select plans for inclusion in the Program. (*Id.* ¶ 38.) To be included in the Program, a plan must successfully respond to a request for proposals ("RFP") issued by the City. (*Id.*)

A number of health plans are currently included in the program, including plans offered by CIGNA, Aetna, Empire, GHI, and HIP. (*Id.* ¶ 27.) The City has agreed to pay for participants' benefits up to the rate charged by HIP for its health maintenance organization ("HMO") product; where an employee chooses a plan with a higher premium, he or she is responsible for the difference in the form of either a payroll or pension deduction. (*Id.* ¶¶ 40, 42.) The City, however, has also created a "Stabilization Fund," the goal of which is to cover the difference between the GHI preferred provider organization ("PPO") rate and the HIP HMO rate. (*Id.* ¶ 41.) According to the Complaint, 93% of the participants in the Health Benefits Program select a plan offered by HIP or GHI, as their costs are far lower than their competitors'. (Compl. ¶ 15.)

2. The Challenged Transaction

On September 29, 2005, GHI and HIP announced their intention to affiliate under a common holding company. (Defs.' 56.1 ¶ 6.) After the transaction was approved by the United States Department of Justice, the New York Superintendent of Insurance, the New York Department of Health, and the New York attorney general, the affiliation was consummated on November 15, 2006. (*Id.* ¶¶ 9, 11, 12, 14, 17.)

B. Procedural History

Plaintiffs filed this action on November 13, 2006, and it was assigned to the Honorable Kenneth M. Karas, District Judge. On November 14, 2006, the parties appeared before Judge Karas on Plaintiff's motion for a temporary restraining order. Judge Karas denied the motion from the bench.

The case was reassigned to my docket on September 4, 2007, and Defendants moved for summary judgment on December 4, 2009. On January 20, 2010 — nine days before its opposition papers were due — Plaintiff submitted a pre-motion letter seeking leave to amend the Complaint. The parties appeared before the Court for a pre-motion conference on January 27, 2010, at which time the Court granted Plaintiff permission to seek leave to amend in its papers opposing Defendants' summary judgment motion. The motions were fully submitted on February 25, 2010.[2]

II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A. Standard of Review

A court may grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

---

[2] The motions were technically fully submitted on February 19, 2010, when Defendants submitted their reply memorandum in support of their motion for summary judgment and in opposition to Plaintiff's motion to amend. On February 25, 2010, however, Plaintiff filed a reply in support of its motion to amend, despite the fact that the Court's Order of January 27, 2010, did not authorize the filing of such a memorandum. Notwithstanding Plaintiff's failure to seek permission to submit a reply brief, the Court has considered it in resolving the pending motions.

as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997)) (alteration in original).

### B. Analysis

#### 1. The Statutory Claims

The City brings claims, exclusively in its capacity as a purchaser of Defendants' products, under four statutory sections:

(1) Section 7 of the Clayton Act, which prohibits acquisitions that "substantially . . . lessen competition, or . . . tend to create a monopoly," 15 U.S.C. § 18;

(2) Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce," *id.* § 1;

(3) Section 2 of the Sherman Act, which renders it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States," *id.* § 2; and

(4) Section 340(1) of the Donnelly Act, which prohibits "[e]very contract, agreement, arrangement or combination whereby [a] monopoly . . . is or may be established or maintained." N.Y. Gen. Bus. Law. § 340(1).

#### 2. The Requirement of a Legally Sufficient Product Market

To state claims under any of the statutes identified above, Plaintiffs must identify the product market in which competition will be impaired. *See Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 254 (S.D.N.Y. 1995) (Sherman Act); *Intellective, Inc. v. Mass. Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 609 (S.D.N.Y. 2002) (Clayton Act); *Astra Media Group, LLC v. Clear Channel Taxi Media, LLC*, --- F. Supp. 2d ---, No. 09 Civ. 3936 (NRB), 2009 WL 5171742, at *10 (S.D.N.Y. Dec. 29, 2009) (Donnelly Act). Failure to plead a legally sufficient product market is grounds for dismissal. *See Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) ("To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes — analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." (citations and internal quotation marks omitted); *accord B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 172 (S.D.N.Y. 1995).

"The relevant market is defined as all products 'reasonably interchangeable by consumers for the same purposes,' because

3

the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). Market definitions recently found to be acceptable by courts in this district have included, for example, "the market for the digital distribution of copyrighted music over the internet," *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 576 (S.D.N.Y. 2007), the market for "top commercial films," *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 311 (S.D.N.Y. 2003), and "the market for the installation of telecommunications wiring and systems in commercial buildings," *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00 Civ. 4763 (RMB), 2002 WL 91625, at *6 (S.D.N.Y. Jan. 23, 2002).

As then-Judge Sotomayor explained, "[a] consumer might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market, but at base, Pepsi is one of many sodas, and NBC is just another television network." *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.). In other words, "'the test for a relevant market is *not commodities reasonably interchangeable by a particular plaintiff*, but commodities reasonably interchangeable by consumers for the same purposes.'" *PepsiCo, Inc. v. Coca-Cola Co.*, No. 98 Civ. 3282 (LAP), 1998 WL 547088, at *10 (S.D.N.Y. Aug. 27, 1998) (emphasis added and additional internal quotation marks omitted) (quoting *Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997).

As the Tenth Circuit has explicitly held, "[p]urchasing constraints on a single consumer, such as a required competitive bidding procedure, do not" create a market of which only that consumer is a member. *See Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366, 368 (10th Cir. 1993); *accord Lockheed Martin Corp. v. Boeing Co.*, 314 F. Supp. 2d 1198, 1228-29 (M.D. Fla. 2004) ("The argument that, because it cannot turn to many suppliers, the U.S. Government has been or will be harmed by unfair trade practices by one of few suppliers does not alter this analysis. The goal of antitrust law is to prevent harm to *competition,* not to prevent harm to one of many purchasers of a product.").

3. The City's Market Definition

The Complaint defines the relevant product market as the "the low-cost municipal health benefits market." (Compl. ¶ 3.) According to the Complaint, this entire market consists of two programs: the Health Benefits Program, administered by the City as described above, and the Transit Health Program, administered by the New York City Transit Authority. (*Id.* ¶ 14.)[3]

The Complaint alleges that within the City's Health Benefits Program, HIP and GHI are the only sellers of "low-cost health insurance." (*Id.*) While other companies offer health insurance, the Complaint alleges, their prices are sufficiently higher such that they do not exist in the same market as HIP and GHI. (*Id.* at ¶¶ 14-15.)

---

[3] Although the Complaint alleges that the Transit Health Program is a member of the relevant product market, it is not addressed in the parties' briefing on the instant motion or in their Local Rule 56.1 statements. Accordingly, the Court will not consider the Transit Health Program in resolving the pending motions.

According to Plaintiff, plans in the relevant market are distinguished from other plans by four characteristics: (1) the absence of pharmacy benefits, (2) the absence of tiered networks, (3) a large number of in-network doctors in the outer boroughs of New York willing to accept relatively low reimbursements, and (4) in the case of the GHI plan, the fact that hospital and medical benefits are separately provided. (Compl. ¶¶ 39.)[4]

4. Analysis

a. The City's Market Definition Is Improperly Limited to a Single Purchaser

Notwithstanding the distinguishing features identified by the City, the market definition contained in the Complaint is deficient as a matter of law, as the market is defined predominantly by the City's and the MLC's roles in selecting plans for inclusion in the Health Benefits Program.

The City concedes that the requirements of the collective bargaining process create significant barriers to entering its proposed market. In other words, an insurer cannot simply decide to enter the Health Benefits Program. Rather, "[t]o change insurers, the City and its unions have to engage consultants and undertake a 15-step process to issue a Request for Proposals and evaluate responsive proposals." (Pl.'s Opp'n at 20.)

As explained in the Declaration of Dorothy A. Wolfe, the Director of the Employee Benefits Program within the City's Office of Labor Relations, "[h]ealth insurance . . . is a mandatory subject of collective bargaining" and "the City cannot modify the Health Benefits Program unilaterally." (Decl. of Dorothy A. Wolfe ¶ 5.) Accordingly, "any significant restructuring of the City's health program would require a number of lengthy and expensive steps." (*Id.* ¶ 18.) In total, awarding a contract to an insurance company to join the Health Benefits Program typically takes anywhere from twelve to eighteen months. (*Id.* ¶ 22.)

The City further concedes that it exercises its gatekeeping role based on its particular needs and policy preferences. (*See* Pl.'s Opp'n at 17 ("The City's program is designed as a result of mandatory collective bargaining with the City's many unions."); *id.* ("These attributes of the City's health plan express policy preferences of the City and its many unions, and are incorporated in multiple collective bargaining agreements."); *id.* ("The unions' influence on the design of the City's health benefits program is a further factor that influences the City's ability to switch to another carrier.")).

Against the backdrop of these significant barriers to entry erected by the City's collective bargaining process, it is disingenuous for the City to argue that the four minor distinguishing features that it has identified serve to define the product market.[5] Rather, the record is clear that the major distinguishing feature of the plans in the City's purported market is that, unlike other plans, the plans in the market have been approved by the City for inclusion in the Health Benefits Program after a lengthy bidding process. Yet the law is equally clear

---

[4] As a fifth supposed difference, the City indicates that "the City and the MLC have worked in conjunction with GHI and HIP to craft the benefits included in their plans." (*Id.*) This is hardly a relevant difference, apart from the fact that it produced the four distinguishing factors noted in the text above.

[5] Indeed, it is undisputed that HIP offers an identical HMO plan to purchasers outside of the Health Benefits Program. (*See* Def.'s 56.1 ¶ 62.)

5

that the preferences of a single purchaser cannot define a product market, *see, e.g.*, *Lockheed Martin Corp.*, 314 F. Supp. 2d at 1228-29; *PepsiCo*, 1998 WL 547088, at *1, and that "[p]urchasing constraints on a single consumer, *such as a required competitive bidding procedure*, do not" create a market of which only that consumer is a member, *see Smalley*, 13 F.3d at 368 (emphasis added).

The City's argument that it has not defined a "single purchaser" market, as individual enrollees choose the program within the market in which they wish to enroll, may be dismissed out of hand. While the individuals choose the member of the proposed "market" in which to enroll, no plan can become a member of this market without being first selected by the City.

Because the City has defined the relevant market solely with regard to its own preferences as a purchaser of health insurance, its market definition is inadequate as a matter of law. This inadequacy alone is sufficient support for granting summary judgment.

### b. The City's Market Definition Is Not Supported by Its Own Expert Report

A further, independent flaw with the City's proposed market definition is that it is not supported by the City's own expert report. Rather than concluding that the two-provider market for "low-cost municipal health benefits" described in the Complaint is a relevant product market for antitrust purposes, the expert report of Professor Frank Lichtenberg concludes that the market for "medical benefits to City employees, retirees, and dependents is a relevant antitrust market." (*See* Decl. of Frank R. Lichtenberg ¶ 20.) His report then analyzes the merger's effects on competition in this market. Notably, Professor Lichtenberg's market definition does not include cost as a bounding factor of the market; unlike the Complaint, it thus does not conclude that GHI and HIP are the only members of the relevant market. (*See id.* Ex. 5.) The City's inability to proffer any evidence in support of reduced competition in the market defined by its own Complaint is fatal to its claims. *See Mahmud v. Kaufmann*, 607 F. Supp. 2d 541, 555 (S.D.N.Y. 2009) (noting that, where the market definition stated in the complaint differed from the market definition asserted in opposition to the defendant's summary judgment motion, "courts will not consider, on a motion for summary judgment, allegations that were not pled in the complaint and raised for the first time in opposition to a motion for summary judgment"), *aff'd*, No. 09 Civ. 1887, 2009 WL 4912180 (2d Cir. Dec. 21, 2009).

### III. PLAINTIFF'S MOTION TO AMEND

Where a party is not entitled to amend as a matter of right, the Federal Rules of Civil Procedure still provide that the "Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Nevertheless, the Court has broad discretion in deciding whether or not to grant such a request." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, No. 06 Civ. 12967 (PAC), 2008 WL 2414047, at *2 (S.D.N.Y. June 12, 2008); *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Factors that are relevant to the exercise of the Court's discretion include (1) the presence of bad faith, dilatory motives, or undue delay on the part of the movant; (2) the potential for prejudice to an opposing party; and (3) whether the sought-after amendment would be futile. *See, e.g.*, *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 523-24 (S.D.N.Y. 2009). Ultimately, "Rule 15(a) is not a shield against dismissal to be invoked as either a

6

makeweight or a fallback position in response to a dispositive motion." *DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ. 318 (RJS), 2009 WL 2242605, at *41 (S.D.N.Y. July 27, 2009).

Courts are particularly skeptical of motions to amend brought in response to motions for summary judgment. *See Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) ("[P]ermitting the proposed amendment would have been especially prejudicial given the fact that discovery had already been completed and [the defendant] had already filed a motion for summary judgment."); *CL-Alexanders Laing & Cruickshank v. Godlfeld*, 739 F. Supp. 158, 167 (S.D.N.Y. 1990) ("When the motion is made after discovery has been completed and a motion for summary judgment has been filed, leave to amend is particularly disfavored because of the resultant prejudice to defendant.").

Given the flaws in Plaintiff's market definition identified above, and detailed in Defendants' able briefing, Plaintiff's desire to amend its Complaint is unsurprising. In this case, Plaintiff moves to file an amended complaint that would (1) propose an additional market definition of "downstate New York suppliers of commercial medical benefits," (2) revise the complaint's existing market definition to clarify that other companies, in addition to HIP and GHI, participate in that market, and (3) add the "upwards pricing pressure" test as an avenue of proof.[6] The motion is denied, both because (1) Plaintiff has exhibited undue delay, and (2) there would be clear prejudice to the opposing party.

With respect to undue delay, Plaintiff has been on notice of the flaws in its market definition since at least November 14, 2006, when Judge Karas denied its motion for a temporary restraining order. As Judge Karas explained in denying Plaintiff's motion, "there are substantial questions about the market definition analysis that the plaintiff has adopted here. *It appears to be focused on what the City is paying for, and not so much on the market of insurance coverage.*" (Tr. Nov. 14, 2006, at 79:6-9 (emphasis added)). He continued that "I think the products . . . are the same, whether they're offered to the City or they're offered to a private large employer, and so I think it raises substantial questions as to whether or not the City's market analysis is really the appropriate starting point." (*Id.* at 79:24 – 80:4.) While Judge Karas indicated that his conclusion was preliminary, and should not be treated as law of the case (*id.* at 80-4:6), Plaintiff was at least on notice as of this date of the potential flaws in its market definition.

In addition to the undue delay noted above, allowing the City's proposed amendment would impose undue prejudice on Defendants. Having required Defendants to spend three and half years defending a lawsuit premised on the City's narrowly defined market, the City would now force Defendants to analyze an entirely different, broader market. And while the City argues that Defendants would need little additional discovery to defend its revised claims, the Court is persuaded that prudent counsel would insist on additional discovery to

---

[6] The "upwards pricing pressure" test "predicts the likely competitive impact of a proposed merger based on how a merger is likely to alter the merged firm's pricing incentives. This analysis can be used in addition to, or instead of, the traditional structural approach of defining relevant markets and calculating market shares to determine the likely effect of a merger." (Decl. of Frank R. Lichtenberg ¶ 107.) The Court notes that its research has not revealed a single decision of a federal court adopting this test. In light of the case law's clear requirement that a Plaintiff allege a particular product market in which competition will be impaired, this absence of authority is hardly surprising.

defend a lawsuit alleging reduced competition in an entirely different market from the one identified in the Complaint.

Because the City waited unduly long to propose amendments that would require Defendants to conduct substantial additional discovery, leave to amend is denied.

### IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted, and Plaintiff's motion to amend is denied. The Clerk of the Court is respectfully directed to terminate the motions located at document numbers 129 and 142 and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: May 11, 2010
    New York, New York